Brian P. FROELICH

v.

John C. ERICKSON, et al.

No. L–98–694.

United States District Court,
D. Maryland.

May 17, 2000.

Michael John Collins (Thomas & Libowitz), of Baltimore, Maryland; John P. Beyel, and Edward B. Deutsch (McElroy, Deutsch & Mulvaney) of Morristown, New Jersey for plaintiff.

David Clarke, Jr., James D. Mathias, and John R. Wellschlager (Piper, Marbury, Rudnick & Wolfe) of Baltimore, Maryland for defendants.

## MEMORANDUM

LEGG, District Judge.

Now before the Court are cross-motions for Summary Judgment. Because of the complexity of the facts, a brief summary is in order.

Plaintiff, Brian Froelich, is a former Chief Executive Officer (CEO) and director of Defendant Senior Campus Living, LLC (SCL). SCL was created in 1996 as a vehicle for Froelich and other employees of Senior Campus Living, Inc. (SCL, Inc.) to purchase the company from its founder, Defendant John Erickson, through a leveraged buy-out (LBO).

Under the structure of the LBO, Froelich and his group did not pay Erickson up front. Instead, Erickson was treated as a creditor. SCL issued Erickson $150 million of preferred interests bearing 9% interest per annum. If the interest was not paid when due, Erickson could declare a default and exercise a number of creditor's remedies. The members of the buy-out group, all of whom were SCL employees, received preferred and/or common interests, all of which were subordinate to Erickson's interests. Only if the company's value exceeded $150 million would the other SCL Members' interests have real worth.

By October 1996, SCL's liquidity had deteriorated, the company was behind in its payments to Erickson, and Erickson had twice been called upon to extend his personal guarantee to facilitate the financing of the company's next major project, Greenspring Village. On October 3, 1996, SCL's Board of Directors voted to remove Froelich as CEO and replace him with Erickson, who resumed control.

As a condition for closing on the Greenspring loan, Equitable [1] required Er-

ickson to provide a $35 million personal guarantee. Erickson made a proposal to the SCL Board under which he would furnish the guarantee, but only if SCL's membership interests were reclassified into a single class of common interests. The reclassification would be based upon the then-current fair market value of the company, as determined by an independent appraisal. Under Erickson's proposal, if the total value of the company was equal to or less than Erickson's preferred interests (with accrued interest, an estimated $160 million), he would own virtually 100% of the company. Any higher value, however, would be distributed to the secondary preferred and common interest holders.

SCL's Board (all of whom were SCL Members) unanimously recommended Erickson's proposal to the membership. Fifteen of the sixteen SCL Members consented to Erickson's proposal. Only Froelich demurred. Subsequently, Coopers & Lybrand, the appraiser retained by the Board, reported that the company's fair market value was $155 million. The Board voted to accept the appraisal. Because the appraised value was less than Erickson's preferred interests, Erickson received more than 99.9% of the reclassified common interests. The remaining Members, including Froelich, received the fractional balance.

One month later, as a housekeeping matter, SCL's Members voted to approve a squeeze-out merger that eliminated the remaining fractional balances in exchange for cash. The only surviving member of the LLC was Erickson. As a result of these transactions, SCL survived as an ongoing company, but Froelich's interests, both preferred and common, were gone.

On March 9, 1998, Froelich filed this lawsuit against John Erickson and SCL.[2]

---

1. Equitable Real Estate Investment Management, Inc.

2. In addition to John Erickson and SCL, Froelich named as defendants Nancy Erickson, John Erickson's wife, and SCL's related

entities, including Erickson Resource Trust, Senior Campus Living Construction, Inc., SCL, Inc., Subco, Inc., and Senior Campus Living Holdings, LLC. For the sake of conve-

The Second Amended Complaint advances fourteen counts, seeking recovery under a number of tort, contract, and statutory theories.

Following extensive discovery, Defendants filed a Motion for Summary Judgment on all counts and Froelich filed a Motion for Partial Summary Judgment on Counts VI (breach of Froelich's employment agreement), XII (breach of the Members Agreement), XIII (breach of the Members Agreement), and XIV (breach of warrant). The motions were exhaustively briefed.

On March 22 and 29, 2000, the Court heard approximately eight hours of argument that focused upon 31 written questions the Court had earlier posed to counsel. For the reasons stated herein, the Court shall, by separate Order, GRANT in part and DENY in part Froelich's Motion for Partial Summary Judgment and GRANT in part and DENY in part Defendants' Motion for Summary Judgment.

As a result of the rulings, the following shall occur:

(i) *Count VI:* SCL is liable to Froelich for severance pay (with accrued interest) as specified in Froelich's employment contract;

(ii) *Count XI:* Froelich is entitled to appraisal rights under Md.Code Ann., Corp. & Ass'n Art. § 4A–705. Accordingly, after consulting with the parties, the Court will appoint an appraiser to value Froelich's interests in SCL as of November 5, 1997, which is prior to the reclassification;

(iii) *Count XIV:* the Court will dismiss this count as moot; and

(iv) *Counts I–V; VII–X; XII–XIII:* the Court will grant Summary Judgment in

favor of the defendants as to all other counts.

## I. Summary Judgment Standard

The Court may grant summary judgment when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *see also Felty v. Graves–Humphreys Co.,* 818 F.2d 1126, 1128 (4th Cir.1987) (recognizing that trial judges have "an affirmative obligation" to prevent factually unsupported claims and defenses from proceeding to trial).

In determining whether there is a genuine issue of material fact, the Court must view the facts, and all reasonable inferences to be drawn from them, in the light most favorable to the non-moving party. *Pulliam Inv. Co. v. Cameo Properties,* 810 F.2d 1282, 1286 (4th Cir.1987). The Court must take care not to foreclose trial when the case presents genuinely disputed, material facts.

Nevertheless, as the Fourth Circuit made clear in *Thompson Everett, Inc. v. National Cable Advertising, L.P.,* 57 F.3d 1317, 1322 (4th Cir.1995), (i) "the mere existence of some disputed facts does not require that a case go to trial," (ii) "[t]he disputed facts must be material to an issue necessary for the proper resolution of the case," and (iii) "the *quality and quantity* of the evidence offered to create a question of fact must be adequate to support a jury verdict." *Id.* at 1323 (citations omitted)(emphasis added).[3]

nience, the defendants will be referred to as John Erickson and SCL.

**3.** Thus, "if the evidence is merely colorable or not significantly probative, it may not be adequate to oppose entry of summary judgment.... While we have recognized generally that when considering a motion for summary judgment, the district court must draw any

permissible inference from the underlying facts in the light most favorable to the party opposing the motion, we hasten to add that those inferences must, in every case, fall within the range of reasonable probability and *not be so tenuous as to amount to speculation or conjecture.*" *Thompson Everett,* 57 F.3d at 1323 (citations omitted)(emphasis added).

Further, the complexity of a case does not make summary judgment inappropriate. To the contrary, Rule 56 may prove a particularly appropriate and useful tool for sorting out the "unusual entanglement of legal and factual issues frequently presented in [complex cases such as] antitrust cases... [and] is favored as a mechanism to secure the just, speedy and inexpensive determination of a case, when its proper use can avoid the cost of trial." *Id.* at 1322 (citations omitted).

The essential question is whether a reasonable fact finder could return a verdict for the non-movant or whether the movant would, at trial, be entitled to judgment as a matter of law. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 158–59, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *Shealy v. Winston,* 929 F.2d 1009, 1012 (4th Cir. 1991).

## II. Statement of Facts

Having carefully considered the record, the Court concludes that the following facts are not in dispute and govern disposition of the case.

In 1983, Defendant John Erickson (Erickson), an experienced real estate developer, began renovating the former St. Charles Seminary in Catonsville, Maryland. Through his company, Senior Campus Living, Inc. (SCL, Inc.), Erickson planned a large campus-style retirement community (the Charlestown continuing care retirement community) having more than 2,000 apartments and offering extensive medical and social services. (*See* Def. Ex. 1.) The parties agree that the size and complexity of the project made it exceptional.

As outlined by Froelich's counsel during oral argument, the financing and development of Charlestown were complex and protracted. Because of limited funds, Er-

ickson built one building at a time, using deposits from residents who moved into one building to pay off his loans and help finance the next building. Charlestown (typical of SCL projects) was financially back-end loaded, meaning that it generated most of the profits only as it neared completion.[4] Charlestown took approximately ten years to complete, but proved to be successful and profitable.

As Charlestown neared completion, Erickson began a second project, the Henry Ford Village in Dearborn, Michigan. Completed in 1999, Henry Ford Village was somewhat of a disappointment, failing to meet pro forma financial projections. The Ford project showed that not all SCL projects would be gold mines on the order of Charlestown. (*See* Def. Ex. 1.)

In 1994, Erickson began developing the Oak Crest Village in Parkville, Maryland. Erickson originally financed the land purchase and construction of Oak Crest through $15 million in Charlestown profits, and a $32 million loan from Mercantile–Safe Deposit & Trust Company (Mercantile). (*See id.*)

In 1994, Erickson also hired the plaintiff, Brian Froelich, as president of SCL, Inc. Although Froelich lacked real estate/senior housing experience, he had held a senior position at American Express Business Travel Services. Both men anticipated that Froelich would learn the business from Erickson and eventually take over day-to-day operations, allowing Erickson more time to pursue personal interests. (*See* Def. Ex. A at 13.)

Upon becoming president, Froelich put up $400,000 to purchase a 10% ownership interest in both SCL, Inc. and the Oak Crest Development Company. Michael Erickson, John Erickson's brother and SCL, Inc.'s Director of Marketing, owned 5% of each entity. Erickson owned the remaining 85%. (*See id.* at 35–37.)

---

4. For example, when a resident dies, and his unit is resold, his estate recovers the purchase price, but SCL reaps any appreciation in the value of the property.

As president, Froelich developed a valuable relationship with Equitable Real Estate Investment Management, Inc. (Equitable).[5] Harry Pierandri, a friend and former college classmate of Froelich, ran Equitable's Prime Property Fund. Equitable lent $15 million to replace the $15 million that SCL, Inc. had put into Oak Crest, freeing up this sum as seed money for new projects. SCL, Inc. anticipated a long-term relationship with Equitable, in which Equitable would finance SCL's upcoming projects, including Greenspring Village in Springfield, Virginia and Seabrook Village in Tinton Falls, New Jersey. (*See id.* at 73–76.)

In March 1996, Erickson announced his intention to pull back from SCL's daily operations. As part of this plan, Erickson named Froelich as CEO of SCL, Inc. and offered to sell his entire interest in the company (85%) for $150 million. Froelich, desirous of purchasing the company but requiring financing, approached both Equitable and Credit Suisse First Boston (First Boston). Equitable and First Boston declined to finance Froelich's proposed buy-out because each determined independently that Erickson's asking price was too high. Both Equitable and First Boston valued SCL, Inc. in a range between $100 and $135 million.[6] (*See* Def. Ex. 2; Def. Ex. 3.)

Froelich was unable to finance the buy-out at Erickson's asking price, and Erickson refused to lower his price. To break this impasse, Froelich proposed a leveraged buy-out (LBO), under which SCL, Inc. would be merged into a new company structured as a limited liability company (LLC). Erickson would receive a debt-type security, entitling him to be paid $150 million with interest over time. Froelich and the other members of the buy-out group would receive the remaining interest in the LLC. (*See* Def. Ex. 2.)

Under Froelich's scheme, the LBO group's ownership would be worth nothing, unless and until SCL's value reached or exceeded Erickson's $150 million stake. Robert Lambrix, who was the Chief Financial Officer of SCL, Inc. in 1996, declined to take part in the "buy-out" because he believed that $150 million was too high a price for Erickson's interests. Lambrix estimated SCL, Inc.'s 1996 value to be between $100 and $120 million. Because the buy-out was too pricey, Lambrix declined to participate and resigned from the company. (*See* Def. Ex. C.)

Both sides to the LBO worked out the details with the assistance of counsel. On January 1, 1997, SCL, Inc. was consolidated into Senior Campus, LLC (SCL). The new ownership structure made Erickson the financier of his own buy-out, and made him SCL's largest creditor. Erickson received preferred interests[7] with an assigned value of $150 million, bearing 9% interest per annum and to be paid out in installments of $135,000 per month. If unpaid, Erickson had the right to declare a default and exercise creditor-type remedies. Froelich and Michael Erickson received preferred interests with assigned values of $8 million and $4 million respectively. These interests were expressly subordinated to John Erickson's interests and did not carry the right to declare a default. The common interests were allotted as follows:

> The Court is not called upon to decide the best method of valuing SCL, Inc. in 1996. The salient point is that two independent and professional lenders placed a price tag on the company at substantially less than $150 million. The 1996 appraisals of SCL, Inc. are consistent with Coopers & Lybrand's subsequent appraisal as of November 5, 1997.

5. Equitable Real Estate Investment Management, Inc. is owned by the Lend Lease Corporation and was recently merged with ERE Yarmouth, another Lend Lease company.

6. At the hearing, Froelich's counsel argued that SCL, Inc.'s true value prior to the buy-out was above $200 million. He reasoned that SCL's then-current assets were worth $155 million. The value of future projects, he argued, would push SCL's worth in 1996 above $200 million.

7. Interests in an LLC are analogous to shares of stock in a corporation.

| | |
|---|---|
| John Erickson | 30% |
| Brian Froelich | 26% |
| Michael Erickson | 10% |
| Thirteen other SCL employees | 34% |

Only if the company obtained a value greater than Erickson's preferred interests would the other Members' interests have any worth.

Two documents primarily governed SCL's operations as an LLC. The Operating Agreement, the LLC equivalent of a corporate charter, defined the classes of interests and their priorities, the role and responsibility of the Board, and the rights and duties of the Members. (*See* Def. Ex. 4.) The Members Agreement, the LLC equivalent of a stockholder's agreement, supplemented the Operating Agreement by defining specifically the rights of the Members and the restrictions on the alienation of Members' interests. (*See* Def. Ex. 35.)

Under the new structure, Froelich became the CEO and president of SCL. The employment agreement that Froelich signed in 1994 when he became president of SCL, Inc. continued in effect. (*See* Def. Ex. 33.) This agreement provided that Froelich would be entitled to severance pay if he was terminated "without cause" during the "Employment Period." Section 4.1 of the agreement states that

> [t]he Employment Period shall commence on January 1, 1995, and shall continue for an initial period of six months. Thereafter, the Employment Period shall continue until terminated by the Company or the Executive upon 60–days' advance written notice.

(*Id.*) SCL and Froelich modified the agreement on December 31, 1994, so that the "Employment Period" commenced on April 1, 1995, and continued for six months. Similar to the original contract, the modified agreement provided that "[t]hereafter, the Employment Period shall continue until terminated by the Company or the Executive upon 60 days advance written notice." (Pl. Opp. Mot. Dismiss Ex. 15.)

Although Erickson became the chairman of SCL's Board, it was contemplated that he would withdraw from the day-to-day operations of the company. Erickson entered into a Consulting Agreement with SCL. (*See* Def. Ex. 32.) The agreement provided that Erickson would consult with SCL on the development of retirement communities. Under the contract, Erickson did not have power to bind the company, unless specifically authorized by SCL. Erickson also committed not to compete with SCL, persuade any SCL customer to cease doing business with SCL, or disparage SCL or SCL's personnel. In exchange for his services, Erickson would receive a yearly salary of $100,000.

The Board was made up of seven directors. In addition to John Erickson, Froelich, and Michael Erickson, they included:

> *Andrew Aldi,* SCL's Director of Development, who had an MBA from Columbia University and previous work experience in real estate investment;
>
> *Bernard Hirl,* SCL's Chief Financial Officer, who had an undergraduate degree in accounting and an MBA in accounting and finance;
>
> *Bruce "Rick" Grindrod, Jr.,* SCL's Director of Operations; and
>
> *John Haas,* SCL's General Counsel.

Froelich was responsible for bringing Aldi, Hirl, and Haas onto the Board. All directors were also SCL Members.

During 1997, SCL was involved in three new projects: Greenspring Village, Seabrook Village, and Oak Crest. Of these, Greenspring Village was the most pressing. SCL's option to purchase the real estate for the Greenspring project was set to expire, and Froelich had been unable to borrow the purchase price. Froelich's difficulty in obtaining the necessary financing raised doubts in the minds of some SCL board members about Froelich's ability to lead the company.

To develop Greenspring, SCL needed loans for at least two types of financing bank construction financing and mezzanine financing. Equitable had agreed to pro

vide $26 million in mezzanine financing for Greenspring Village, but only if SCL first obtained a $55 million commitment of bank construction financing.[8] (*See* Def. Ex. E at 52.)

Froelich had difficulty securing the bank construction financing on his own. On two occasions, therefore, Erickson stepped in to personally guarantee the necessary loans. In August 1997, Erickson, with Froelich's consent, personally guaranteed a $35 million sixty day bridge loan from Mercantile. (*See* Def. Ex. A at 411–12.) This loan permitted SCL to purchase the Greenspring property. During those sixty days, Froelich anticipated securing a loan from Allegis Realty Investors LLC for the remaining $20 million.[9] (*See* Pl.Ex. 21 at 57.) In September 1997, when SCL realized that the loan with Allegis would not materialize for another sixty to ninety days, Mercantile agreed to extend the entire $55 million in exchange for Erickson's guarantee of the whole loan.[10] (*See* Pl.Ex. 21 at 62; Def. Ex. 6.)

By facilitating the Mercantile loan, Erickson also enabled SCL to satisfy Equitable's precondition for the mezzanine financing. Due to these two interventions by Erickson, Equitable scheduled the Greenspring mezzanine closing for October 3, 1997. (*See* Def. Ex. 1, ¶ 7.)

8. Equitable also offered similar terms of financing for Seabrook Village. The disputes in this case, however, revolve primarily around the Greenspring financing.

9. Pursuant to Mercantile's lending limits, Mercantile was only able to lend $30 million, without another entity participating in the transaction. (*See* Pl.Ex. 21 at 57.)

10. At oral argument, Froelich's counsel contended that Allegis was willing to lend the missing $20 million in August 1997. According to the SCL Board minutes of October 28, 1997, however, the Allegis loan wouldn't close until after the Greenspring closing. (*See* Def. Ex. 13.) This apparent disagreement is not material. Froelich welcomed Erickson's intervention, which enabled both the bank construction and mezzanine financing to go forward.

As part of the August construction loan, Mercantile imposed a liquidity covenant, requiring SCL's cash balance to remain above $10 million. When financing was not forthcoming, SCL was forced to pay for development work at Greenspring out of existing cash balances. SCL's cash balance dropped from $23 million in the beginning of 1997 to under $10 million in August 1997. In that month, Mercantile agreed to reduce its liquidity covenant to $8 million. (*See* Def. Ex. B at 223–24.)

By September 1997, SCL's cash balance had fallen below $8 million. In response to SCL's deteriorating cash position, Mercantile did not declare a default, but did require Bernard Hirl to submit daily cash reports. (*See* Def. Ex. E at 295.) Also in September, SCL stopped making Erickson's monthly payments of $135,000. Hirl believed that this measure was necessary to conserve SCL's cash. (*See id.* at 51–52.)

During this time, doubts about Froelich's leadership intensified.[11] Bruce Grindrod, testified that by late September 1997, his "assessment of the situation with [SCL's] financing, regulatory approvals as well as [his] opinion on strategic direction of the company was grave enough that [he] was going to move for John [Erickson] to become CEO." (Pl.Ex. 6 at 98.) Doubts were also shared by Michael Erickson and

11. At oral argument, Froelich's counsel contended that the Board's doubts regarding Froelich's ability to obtain the financing were overblown. This contention misses the point. Under the business judgment rule, the issue is not whether the Board's perceptions were accurate, but whether they were in good faith. In deciding the summary judgment motion, it is irrefutable that (i) SCL's cash balance had deteriorated enough to alarm the Board and Mercantile, (ii) Froelich had been unable to obtain the financing without Erickson's guarantees, (iii) under the LBO Erickson was supposed to be receiving regular payments as he "cashed out" of the business, and (iv) instead, Erickson was called upon to keep SCL afloat by extending personal guarantees for tens of millions of dollars.

Andrew Aldi. (*See* Pl.Ex. 11 at 9; Pl.Ex. 10 at 157–58.) Prior to the regularly scheduled October board meeting, Erickson discussed Froelich's performance with Grindrod, Michael Erickson, and Andrew Aldi. He did not, however, discuss the issue with the other board members. (*See* Pl.Ex. 5 at 244–52.)

October 1, 1997 was the date for a regularly scheduled board meeting. Coincidentally, the Equitable closing was scheduled for two days later, October 3rd. At the board meeting, Erickson expressed his concerns regarding Froelich's ability to lead the company. Grindrod moved to remove Froelich as CEO and replace him with Erickson. Froelich would remain as president and Board member, however. (*See* Def. Ex. 7.)

When the meeting recessed for a break, Froelich, without discussing his intention, telephoned his contact at Equitable, Harry Pierandri, to determine whether his removal would be a "material adverse event" that would hinder the scheduled Greenspring closing. Pierandri responded that such a change would require examination. (*See* Def. Ex. G at 51–52.)

When the meeting resumed, Froelich informed the Board that his removal might forestall the Equitable closing. Nevertheless, in a 3–2 vote, with John Erickson and Froelich abstaining, the Board voted to remove Froelich as CEO and install Erickson. Those voting in favor of the change in leadership were Grindrod, Andrew Aldi, and Michael Erickson. John Haas and Bernard Hirl voted against Froelich's removal. (*See* Def. Ex. 7.) At his deposition, Aldi testified that the vote was "stressful" because he considered Froelich a friend and Froelich had brought him into the company. Nevertheless, Aldi considered the change in leadership to be for the good. (*See* Pl.Ex. 10 at 175–81.)

Under the Operating Agreement, SCL's officers serve at the pleasure of the Board, and nothing in Froelich's employment agreement guaranteed Froelich's tenure as CEO. Accordingly, the Board was autho-

rized to remove Froelich and bring back Erickson.

Although scheduled for October 3rd, the Greenspring closing did not occur on that date. After the October 1st board meeting, Froelich formally advised Pierandri of the change in leadership. Equitable decided to postpone the settlement to permit it to investigate whether the change constituted a "material adverse event," permitting it to cancel the loan commitment. (*See* Def. Ex. 9.)

Erickson traveled to New York to meet Pierandri in a vain attempt to convince Equitable to proceed with the closing as scheduled. Pierandri characterized Erickson's attempt as an "impassioned plea." (Def. Ex. F at 101.) Equitable decided, however, to proceed with due diligence. Because of Pierandri's friendship with Froelich, Equitable assigned Constantino Argimon to conduct the review. (*See* Def. Ex. G at 101.)

After some three weeks of due diligence, Argimon summarized his findings in a memorandum to his superiors. (*See* Pl.Ex. 9.) He concluded that the change in leadership was not a material adverse event that would bar financing. (*See* Pl.Ex. 9; Def. Ex. G at 111, 114.) To the contrary, Argimon concluded that the change strengthened SCL. Argimon's assessment included the following: (i) Argimon found working with Froelich difficult; (ii) Froelich lacked a real estate background and had difficulty "negotiating a real estate deal with institutional money"; and (iii) during Froelich's tenure, SCL's projects were somewhat stagnant. Argimon did not express unqualified approval of Erickson, but because of Erickson's experience, Argimon believed that SCL would be better off with Erickson at the helm. (*See* Pl.Ex. 9.)

Despite Equitable's favorable view of the change in leadership, Argimon informed Erickson that Equitable was still concerned about SCL's financial condition. Argimon stated that Equitable would require an additional $35 million in capital before Equitable could close on Greenspr-

ing. After negotiation with Erickson, Equitable agreed to reduce the demand to a $35 million personal guarantee from Erickson. (*See id.* at 111–14.)

While Erickson was negotiating with Equitable, Froelich contacted First Boston with a view to securing the mezzanine financing. On October 8, 1997, First Boston wrote to SCL expressing an interest in investing $35 million in SCL in exchange for 30% of SCL's common interests. First Boston stated, however, that this offer was subject to due diligence to determine, among other things, whether SCL's common interests were valued at $116.7 million. To satisfy this condition, SCL's total value (including the preferred interests) would have to be more than $200 million. (*See* Def. Ex. 10.)

To explore this avenue, Erickson arranged a meeting with Diana Reid (now Diana Chazaud) of First Boston. Reid was not impressed with Erickson, finding him arrogant. At the end of the meeting, Erickson informed Reid that he was taking back control of SCL, and that SCL did not need financial help from First Boston, but could obtain financing from other sources. (*See* Pl.Ex. 16 at 54–55.)

The next board meeting took place on October 28, 1997. The major topic under consideration was the merits of the Equitable proposal vis-a-vis the First Boston expression of interest. Bernard Hirl stated his view that the First Boston proposal would never pan out. The proposal was predicated on SCL's common interests being worth $116.7 million, and Hirl believed that the interests were not worth that much. Other Board members expressed concern that First Boston's due diligence would take four to six weeks, which was not soon enough to resolve SCL's pressing liquidity problem.

In sum, the Board's collective assessment was that the First Boston expression

of interest was unlikely to pan out, and that the Equitable proposal was more realistic, particularly in light of SCL's time pressure to close on Greenspring. (*See* Def. Ex. 13.)

The discussion then turned to the Equitable proposal. As the Board knew, Equitable was demanding either a $35 million cash infusion, or, at a minimum, Erickson's personal guarantee in that amount. Erickson offered to extend his guarantee, but only if SCL's membership interests (both preferred and common) were reclassified into a single class of common interests.[12] The reclassification would be based upon the fair market value of the company, as determined by an independent appraiser. The new class of common interests would be apportioned among the SCL Members according to the value of their holdings.

Thus, if the total appraised value of the company was equal to or less than Erickson's preferred interests (approximately $160 million), Erickson would end up with virtually 100% of SCL. The Board understood that only if the appraised value exceeded $160 million would the subordinated preferred interests or common interests have any real value. (*See* Def. Ex. 16.)

The Board formed two committees. The first committee was assigned to negotiate with Erickson regarding his proposal, and also to explore available alternatives to Erickson's offer. The second committee was assigned to negotiate with Equitable regarding the Greenspring closing. Neither Erickson nor Froelich participated in the formation of the committees, or in the committees themselves. (*See* Def. Ex. 13.)

On October 31, Erickson, as CEO, gave Froelich notice that Froelich's employment with SCL would terminate in sixty days. (*See* Def. Ex. 20.)[13] Also on October 31st, two-thirds of the Members (pursuant to written consents) voted to remove Froelich

---

12. $64 million of Erickson's preferred interests would be excluded from the reclassification. As was contemplated in the Operating Agreement, once Charlestown was sold, Erickson would be cashed out in that amount.

13. The Board unanimously approved Froelich's termination at the November 3rd board meeting. (*See* Def. Ex. 21.)

from the SCL Board, effective immediately. Froelich, however, remained an SCL Member. (*See* Def. Ex. 20, 21.)

On November 3, 1997, the Board reviewed the committees' reports and unanimously voted to recommend to the Members that they accept Erickson's proposal. (*See* Def. Ex. 21.) The next day, the Board distributed to the Members a twenty-eight page disclosure statement describing Erickson's proposal and laying out the Board's reasons for recommending that it be accepted.

As the statement made clear, if the proposal was accepted and the appraised value was less than the value of Erickson's interests, Erickson would own virtually the entire company, and the Members would lose their equity interests. The document explained that an independent appraiser would value the company as of the date of the Members' consent. Each Member was given a written ballot on which the Member could consent to or oppose Erickson's proposal. (*See* Def. Ex. 22.) When the ballots were returned, fifteen out of the sixteen Members had signed written consents, with only Froelich objecting. (*See* Def. Ex. 23.)

To implement Erickson's proposal, a subcommittee of the Board retained Coopers & Lybrand, LLP (Coopers). Coopers was instructed to appraise SCL's value as of November 5, 1997. (*See* Pl.Ex. 30.) In carrying out the appraisal, Coopers reviewed the status of SCL's current and proposed projects, met with SCL's management, reviewed SCL's financial documents, compared SCL's financial data with data for comparable publicly held companies, and toured SCL's offices and projects.

On December 31, 1997, Coopers issued a nine page report that explained the methodology of the valuation and concluded that SCL's fair market value as of November 5, 1997 was $155 million. According to the report, Coopers discounted SCL's pro-

jected value for future projects by 35%.[14] This discount rate reflected Coopers's view as to the vagaries of financing and other contingencies that might cancel the projects or make them less profitable than SCL's planning assumptions. (*See* Pl.Ex. 25.) On January 13, 1998, the Board accepted Coopers's valuation, and by doing so, accepted Coopers's discount rate for future projects. (*See* Def. Ex. 25.)

Because the value of the company was less than Erickson's preferred interests, the reclassification resulted in Erickson holding 99.9% of the new common interests and Froelich holding 0.000001091548107% of the new interests.

On February 18, 1998, as a housekeeping measure, SCL's Members approved a squeeze-out merger to eliminate all interests of less than one-tenth of 1%. After the squeeze-out, the only surviving member of the company was John Erickson. All squeezed-out Members received the cash value of their interests, post-reclassification. (*See* Def. Ex. 28.) Froelich's approximate cash value was $1.50. On March 10, 1998, Froelich filed his objection to the merger and demanded an appraisal. (*See* Def. Ex. 29.)

At this time, it is necessary, by way of digression, to describe the mechanics by which SCL sold the Charlestown project. As reflected by § 4.5.1 of the Operating Agreement, during the formation of the LLC, the LBO group contemplated that SCL would sell Charlestown. Section 4.5.1 provides that the proceeds from the sale of Charlestown would be used to redeem a portion of Erickson's preferred interests. Although no exact date was set for the sale or distribution, § 4.5.1 explicitly states that the proceeds would be distributed to Erickson "as soon as practicable, consistent with the exercise of the Board's sound judgment." (Def.Ex. 4.) Board members understood this provision to mean that SCL could not hold onto the

---

**14.** Coopers listed future projects as Greenspring Village, Seabrook Village, Great Oaks Campus and Village, and Pequonnock Campus and Village. Current projects were Oak Crest and Charlestown. (*See* Pl.Ex. 25.)

proceeds of Charlestown to bolster SCL's value. (*See* Def. Ex. D at 271; Def. Ex. E at 165–67; Def. Ex. H at 141.)

In contemplation of the Charlestown sale, Erickson's proposal made one exception to the overall plan that all existing preferred and common interests would be reclassified. This exception, apparently driven by tax considerations, specified that Erickson would retain preferred interests valued at $64 million. When SCL sold Charlestown to a company called Charlestown Community, Inc. (CCI) in January 1998, Erickson sold his remaining preferred interests to CCI in exchange for a $64 million short-term note. SCL then redeemed the preferred interests, which were now held by CCI, "paying" CCI with an interest in a limited liability partnership owning real estate worth $64 million.

On March 9, 1998, Froelich filed the present lawsuit against John and Nancy Erickson, SCL, Erickson Resource Trust, Senior Campus Living Construction, Inc., SCL, Inc., Subco, Inc., and Senior Campus Living Holdings, LLC. Following the filing of an Amended Complaint and Second Amended Complaint, and extensive discovery, both parties filed Motions for Summary Judgment, which were fully briefed. The Court heard arguments on March 22 and 29, 2000. For the reasons stated below, the Court shall, by separate Order, grant in part and deny in part both motions.

## III. Discussion

The Second Amended Complaint advances the following fourteen counts:

I: breach of fiduciary duty;

II: breach of the implied covenant of good faith and fair dealing;

III: fraud by Erickson;

IV: fraud by SCL;

V: breach of contract;

VI: breach of Froelich's employment agreement;

VII: request for a declaratory judgment;

VIII: request for injunctive relief;

IX: unjust enrichment;

X: conversion;

XI: claim for appraisal pursuant to Maryland Corporations and Associations Article § 3–208;

XII, XIII: breach of the Members Agreement; and

XIV: breach of warrant.

There is considerable factual overlap among the counts. In general, each count relies upon one or more of the following factual contentions:

(i) Erickson committed fraud when he signed the LBO documents in 1996. When Erickson agreed to the LBO, he stated his intention to withdraw from business life to pursue other interests. Froelich contends that this assertion was fraudulent because Erickson always intended to return and resume control of SCL;

(ii) among the LBO contracts, Erickson signed a consulting agreement in which, in exchange for $100,000 per year, Erickson agreed to be available for consultation. Erickson also undertook not to compete with SCL, persuade any SCL customer to cease doing business with SCL, or disparage SCL or SCL's personnel.

Erickson suffered seller's remorse, coming to the realization that he had sold SCL too cheaply. Thereupon, he created a scheme to oust Froelich and regain control of the company. In furtherance of the scheme, Erickson (a) disparaged Froelich in conversations with Board members, (b) created an artificial financial crisis by ousting Froelich on the eve of the Equitable closing, thereby prompting Equitable to demand a capital infusion that only Erickson could meet, and (c) disparaged SCL and Froelich to Equitable and First Boston. By pursuing this scheme, Erickson violated the terms of his consulting agreement, violated the fiduciary duty that he, as a director, owed to the company, and violated the fiduciary duty that he, as a majority interest holder, owed to the other Members;

(iii) Erickson and the SCL Board manipulated the Coopers & Lybrand valua-

tion to ensure that only Erickson would have any interests in SCL after the reclassification;

(iv) to secure Board approval of the reclassification and valuation, Erickson bribed each director with the promise of a $100,000 bonus;

(v) the reclassification violated the Members Agreement;

(vi) the reclassification and valuation were approved pursuant to sham corporate formalities cynically created to rubber stamp Erickson's proposal;

(vii) SCL breached Froelich's employment agreement by refusing to remit severance pay; and

(viii) the November 5, 1997 reclassification and subsequent freeze-out merger triggered Froelich's appraisal rights.

Although Froelich's complaint advances a variety of charges, at base it challenges a handful of corporate actions taken by SCL's Board and its Members. In analyzing each count, therefore, the Court must consider the following questions:

(i) Did the corporate documents or Maryland corporate law authorize the Board to take the actions that Froelich challenges?

(ii) If the Board or the Members had the power to act, by what standard (e.g., business judgment rule or fiduciary duty) should the Court review the Board's exercise of that power? and

(iii) Did the Board meet the appropriate standard?

Because this case arises in the context of corporate decisions by SCL's board of directors, Froelich's claims are subject to the business judgment rule. The business judgment rule recognizes that corporate decisions will often generate acrimony among the various corporate constituents. The rule is designed in part to prevent a court from second guessing corporate decisions and to give directors proper latitude in managing the business.

The rule accomplishes this by (i) defining the scope of the duty that a corporate director owes to the company, and (ii) limiting liability by presuming that the directors of a corporation act in the corporation's best interests and in good faith. *See* Md.Code Ann., Corp. & Ass'n Art., § 2–405.1; *Zimmerman v. Bell,* 800 F.2d 386 (4th Cir.1986); *Wittman v. Crooke,* 120 Md.App. 369, 707 A.2d 422 (Md. Spec.App.1998); *Yost v. Early,* 87 Md.App. 364, 589 A.2d 1291 (Md.Spec.App.1991). A court will overturn a board's decision only if the challenger produces evidence establishing that the directors acted in bad faith. *See Nat'l Ass'n for the Advancement of Colored People v. Golding,* 342 Md. 663, 679 A.2d 554 (Md.1996).

Section 5.1.2 of SCL's Operating Agreement states that SCL's directors are subject to the duties of a corporate fiduciary as defined by Maryland law. (*See* Def. Ex. 4.) Thus, SCL's Board decisions are measured against the business judgment rule just as if SCL were a traditional corporation, rather than an LLC.

Before addressing each count of the Complaint, the Court will summarize the state of the evidence with respect to each of Froelich's factual contentions:

(i) Froelich has produced no evidence that when Erickson signed the LBO documents in 1996, he intended to return eventually. Froelich has also failed to identify any motive that might have prompted Erickson to pursue such an irrational plan; [15]

(ii) no reasonable jury could conclude that Erickson "scuttled" the Equitable closing as a means of hijacking the company. As of October 1, 1997, the closing was at hand only because Erickson had twice, with Froelich's blessing, intervened to facilitate it. Had Erickson wished to create a financial crisis, he could have done so directly by (a) withholding his guarantees, and (b) declaring a default after the company had failed to make the required monthly payments of $135,000. There is

**15.** In opposing Summary Judgment, Froelich virtually abandoned this contention.

also uncontroverted evidence that in early October 1997, Erickson "begged" Equitable to proceed to closing on the mezzanine loan.

There is no persuasive evidence that the Board acted in bad faith when it (a) decided that the First Boston proposal was infeasible, and (b) decided to pursue Erickson's proposal as the best alternative for the company and the Members. These board decisions were not only objectively reasonable, but they were ratified by fifteen out of the sixteen Members. Thus, the Board actions are protected from second guessing by the business judgment rule;[16]

(iii) there is no evidence that the Coopers valuation was anything other than the accounting firm's honest effort to appraise the company. Moreover, the Board's acceptance of the appraisal is protected by the business judgment rule;

(iv) there is some evidence that Erickson mentioned bonuses in connection with the sale of the Charlestown project, but there is no evidence under which a reasonable jury could view this amorphous suggestion as a bribe;

(v) the Members Agreement (§§ 6, 16, and 18(f)) provides that the company can redeem a Member's interest only for par value. These sections, however, apply solely to cash redemptions of interests, and not to exchanges of preferred interests for common interests;

(vi) at their depositions, the Board members consistently testified that they viewed Erickson's proposal as the only realistic plan for bailing the company out of its financial difficulties. The Board members unanimously voted to approve Erickson's proposal and recommend it to the Members, despite the likelihood that their personal interests in the company would be extinguished. They considered their interests to be valueless because the company's worth was less than Erickson's preferred interests. Fifteen out of the sixteen Members consented to Erickson's proposal after full disclosure. No evidence would lead a reasonable jury to find that the Board acted in bad faith. Accordingly, the corporate procedures and decisions are not subject to second-guessing;

(vii) the company breached Froelich's employment agreement. The plain language of the agreement entitles Froelich to severance pay because he was terminated during his "Employment Period"; and

(viii) the reclassification and the squeeze-out should be viewed as related parts of one transaction. Froelich properly exercised his appraisal remedies for the value of his interests as of November 5, 1997. Statutory appraisal will be ordered.

The Court will address each count in turn. Certain counts (counts II, III, IV, V, and IX) are so weak that they deserve little analysis. Accordingly, the Court will dispose of them first, with little discussion.

## A. Count II: Breach of the Implied Covenant of Good Faith and Fair Dealing

The relationship between Froelich, Erickson, and SCL is governed by several contracts. In Count II, Froelich alleges that Erickson breached an overarching, generalized covenant of good faith and fair dealing.[17]

---

16. Further, nothing in the consulting agreement prohibited Erickson, as chairman of the Board, from discussing Froelich's performance with other Board members. To the contrary, as a director, Erickson was obligated to review Froelich's performance.

17. He alleges that Erickson breached this implied covenant through the following acts: (1) wrongfully disparaging SCL and SCL's management (including Froelich) to potential investors;

(2) interfering with SCL's business operations; (3) engaging in self-dealing with respect to the reclassification and elimination of interests; (4) devaluing SCL and Froelich's interests; and (5) engaging in self-dealing with respect to the sale of the Charlestown property.

In every contract, Maryland recognizes an implied covenant of good faith and fair dealing. It is unclear, however, whether Maryland law recognizes a cause of action for breach of the duty of good faith and fair dealing that is separate from a breach of the underlying contract.[18]

 Assuming *arguendo* that Maryland does recognize a separate cause of action, the duty of good faith and fair dealing is so narrow that it does not apply here. Explaining the duty in the context of a loan agreement, the Maryland Court of Special Appeals stated that, "the duty of good faith merely obligates a lender to exercise good faith in performing its contractual obligations; it does not obligate a lender to take affirmative actions that the lender is clearly not required to take under its loan documents." *Parker v. Columbia Bank*, 91 Md.App. 346, 366, 604 A.2d 521 (Md. Spec.App.1992).

The court emphasized that the duty of good faith and fair dealing "simply prohibits one party to a contract from acting in such a manner as to prevent the other party from performing his obligations under the contract." *Id.;* *see also, Enfield Equipment Co. v. John Deere Co.*, 64 F.Supp.2d 483 (D.Md.1999); *Dupont Heights Limited Partnership v. Riggs Nat'l Bank*, 949 F.Supp. 383 (D.Md.1996).

 Thus, the duty does not add obligations to a contract. It might, perhaps, provide a contract remedy when a party affirmatively prevents the other party from performing its obligations and that hindrance alone does not constitute a breach. Such a scenario does not apply to the instant case.[19] Summary Judgment in favor of the defendants as to Count II is therefore appropriate.

**18.** The Maryland Court of Appeals has never explicitly stated that there is no cause of action for breach of the implied covenant of good faith and fair dealing. Nevertheless, recent cases decided by this Court have consistently held that there is not a separate cause of action under Maryland law. *See Baker v. Sun Co.*, 985 F.Supp. 609 (D.Md. 1997) (Young, J.); *Howard Oaks, Inc. v. Maryland Nat'l Bank*, 810 F.Supp. 674 (D.Md.

## B. Counts III and IV: Fraud

In Count III, Froelich alleges that in 1996, Erickson fraudulently represented that he would (i) relinquish all authority to implement policy or otherwise supervise SCL's business operations and (ii) not make any disparaging remarks about SCL.

 The elements for fraud in Maryland are:

(i) false representation;

(ii) knowledge that the representation was false, or reckless indifference for the truth;

(iii) purpose of defrauding the person claiming to be injured;

(iv) justifiable reliance on the representation by the injured person; and

(v) actual damages.

*See Miller v. Fairchild Industries, Inc.*, 97 Md.App. 324, 341–42, 629 A.2d 1293 (Md. Spec.App.1993). Maryland courts have emphasized that fraud exists only when the speaker had (i) intent to defraud, and (ii) knowledge that his statement was false at the time it was made. *See id.* at 343–44, 629 A.2d 1293.

 Froelich has presented no evidence that in 1996, at the time of the LBO, Erickson intended to take back the company. In opposing summary judgment, Froelich points to evidence that Erickson decided to resume control in October 1997. (*See* Pl. Mem. Opp. Summ. J. at 46–47.) These allegations are irrelevant to Erickson's motivation in 1996 when he signed the LBO agreements.

Because Froelich cannot establish Erickson's intent to defraud, Summary Judgment must be granted in favor of the defendants on Count III. Count IV is iden-

1993) (Smalkin, J.). Instead, a breach of the covenant is simultaneously a breach of the contract, and can be remedied by a breach of contract suit.

**19.** In opposing Summary Judgment as to Count II, Froelich made only a perfunctory attempt to save this count, virtually conceding the point.

tical to Count III, except that the named defendant is SCL, rather than Erickson. Because Froelich's fraud claim against Erickson fails, his fraud claim must fail against SCL as well. Therefore, this Court will also grant Summary Judgment in favor of SCL on Count IV.

### C. Count V: Breach of Contract

In the Second Amended Complaint, Froelich alleges that SCL and Erickson contractually agreed that (i) Erickson would relinquish all authority to implement policy or otherwise supervise SCL's business operations, and (ii) Erickson would not make any disparaging remarks about SCL. In moving for summary judgment, the defendants pointed out that Froelich's Second Amended Complaint nowhere specifies the contract that Erickson allegedly breached by the actions described above.

Defendants are correct; Count V does not identify the contract that Erickson and SCL allegedly breached. This omission persisted through discovery. Only in his Opposition to the Summary Judgment motion did Froelich assert that Count V is based upon Erickson's reclassification proposal. (*See* Pl. Mem. Opp. Summ. J. at 43–44.) This identification comes too late. Because Froelich failed to provide discovery as to the basis of Count V, Summary Judgment in favor of the defendants is warranted.

Froelich is not prejudiced by this decision. Count V is merely an awkward attempt by Froelich to re-frame his breach of fiduciary duty claim as a separate claim for breach of contract. All of his allegations are more appropriately advanced in other counts of the Complaint.

### D. Count VI: Breach of Employment Agreement

In Count VI of the Second Amended Complaint, Froelich alleges that SCL breached Froelich's employment agreement by not remitting severance pay when he was terminated as president. Section 4.2 of Froelich's employment agreement states that

[i]n the event the Executive's employment is terminated by the Company without cause during the Employment Period, the Executive will be entitled to receive separation pay in an amount equal to the sum of (i) one year's Base Salary at the rate in effect on the date notice of termination is given, plus (ii) the Targeted Bonus for the year in which notice of such termination is given. . . .

(Def.Ex. 33.) Section 4.2 defines "cause" as a felony conviction involving (i) "dishonesty regarding the Executive's duties or the property of the Company and (ii) substantial personal enrichment for the executive." (*Id.*) According to the language of Froelich's employment agreement, the Board's termination of Froelich as president was therefore "without cause."

SCL argues that Froelich is not entitled to severance because he was not terminated during the "Employment Period." Section 4.1 states that

[t]he Employment Period shall commence on January 1, 1995, and shall continue for an initial period of six months. Thereafter, the Employment Period shall continue until terminated by the Company or the Executive upon 60–days' advance written notice.

(*Id.*) SCL and Froelich modified the agreement on December 31, 1994, so that the "Employment Period" commenced on April 1, 1995, and, again, continued for six months. Similar to the original agreement, the agreement provided that "[t]hereafter, the Employment Period shall continue until terminated by the Company or the Executive upon 60 days advance written notice." (Pl. Opp. Mot. Dismiss Ex. 15.)

Maryland applies an objective theory towards the interpretation of contracts. *See DeLeon Enterprises, Inc. v. Zaino,* 92 Md.App. 399, 608 A.2d 828 (Md. Spec.App.1992); *Gilbane Building Co. v. Brisk Waterproofing Co.,* 86 Md.App. 21, 585 A.2d 248 (Md.Spec.App.1991). Under this theory, "the written language embodying the terms of an agreement will govern the rights and liabilities of the parties,

irrespective of the subjective intent of the parties ... if the language of the contract is clear and unambiguous, and free of fraud, duress, or mistake." *DeLeon Enterprises*, 92 Md.App. at 406-07, 608 A.2d 828. The Court must determine how a reasonable person in the position of the parties would interpret the contract, and not what the parties subjectively intended. *See Gilbane Building*, 86 Md.App. at 27, 585 A.2d 248.

■ SCL contends that the "Employment Period" consisted only of the first six months of employment, and did not continue after that interval. The Court finds that SCL's interpretation has no basis under the plain language of the employment agreement. It is true that the agreement defines the initial "Employment Period" as the first six months of employment. Nevertheless, section 4.1 specifically states that after the first six months, the "Employment Period" continues until SCL terminated Froelich or Froelich resigned. Because Froelich was terminated during his "Employment Period," the Court will grant Summary Judgment on Count VI in favor of the plaintiff and against the defendant, and award Froelich his severance pay, plus accrued interest.

### E. Count IX: Unjust Enrichment

Froelich claims that the defendants unjustly enriched themselves by replacing Froelich as CEO and president and by diluting his interests to nearly zero, all without his consent or compensation.

■ In Maryland, the elements of unjust enrichment are:

(i) a benefit conferred upon the defendant by the plaintiff;

(ii) the defendant's knowledge of the benefit; and

(iii) the acceptance by the defendant of the benefit under such circumstances as to make it inequitable to retain the benefit without payment of its value.

*See Klein v. Fidelity & Deposit Co.*, 117 Md.App. 317, 345, 700 A.2d 262 (Md. Spec.App.1997). To sustain an unjust enrichment claim, a plaintiff must have provided an actual benefit to the defendant. "[M]erely alleging one's own loss is not enough." *Kline v. Signet Bank*, 102 Md. App. 727, 733, 651 A.2d 442 (Md. Spec.App.1995). Also, when an express contract is present, the plaintiff cannot recover under the theory of unjust enrichment. *See Bright v. QSP, Inc.*, 20 F.3d 1300, 1306 (4th Cir.1994).

The usual case of unjust enrichment involves a plaintiff who, absent an express contract, performs a service for, or provides a benefit to, the defendant. The defendant accepts the benefit of the service, but fails to compensate the plaintiff. Under this theory of quasi-contract, the plaintiff is equitably entitled to receive as compensation the value of the benefit he provided to the defendant.

■ Froelich states in his Opposition to Summary Judgment that Erickson and SCL were unjustly enriched by their breach of the Members Agreement, Erickson's breach of fiduciary duty with respect to the reclassification, Erickson's offer of "bonuses" to the Board, and the manipulation of the valuation by Coopers & Lybrand.

Defendants are entitled to Summary Judgment on this count. Froelich cannot rely upon breaches of the Members Agreement to establish an unjust enrichment claim. When an express contract is present, the plaintiff cannot recover under a theory of unjust enrichment. Moreover, Froelich cannot rely upon breaches of a fiduciary duty to establish a quasi-contract theory of relief. Count XI is another instance of Froelich's attempt to shoe-horn the facts into an inapposite theory of recovery.[20]

---

20. It is also unclear what benefit Froelich asserts that he conferred upon the defendants or what compensation Froelich is entitled to receive. At base, Froelich is merely arguing under another guise that he is entitled to recover because SCL breached its contracts and committed torts against him.

**F. Count XII and XIII: Reclassification of Froelich's Preferred and Common Interests Breached the Members Agreement**

 Froelich alleges that the November 1997 reclassification of his membership interests breached the Members Agreement. By equating the reclassification to a redemption of interests, Froelich asserts that §§ 6, 16, and 18(f) of the Members Agreement apply, obligating SCL to pay him the par value for his interests, $ 8 million.

Section 6 of the Members Agreement provides that SCL may redeem a Member's interests only by purchasing them at par value. (*See* Def. Ex. 35.) The company may bypass § 6 by amending the Members Agreement through unanimous consent of the Members pursuant to § 16 or by entering into a supplemental agreement with a Member to modify that Member's rights pursuant to § 18(f). (*See id.*) Because SCL did not purchase Froelich's interests at par value, and did not obtain unanimous consent or a supplemental agreement, Froelich asserts that SCL breached the Members Agreement.

Integral to Froelich's position is the definition of "redemption." If the redemption described in § 6 includes a reclassification of interests, Froelich prevails. If, however, a redemption does not include a reclassification, then the Members Agreement was not breached and the Court must look to other provisions in the Operating Agreement and Members Agreement to determine whether the reclassification was proper.

The Court finds that § 6 of the Members Agreement did not apply to the reclassification, and thus the Members Agreement was not breached. Section 6 contemplates a transaction in which the company purchases a Member's interests in exchange for cash. (*See* Def. Ex. 35.) Here, SCL's Board did not buy back Froelich's or any other Member's interests. Instead, after the reclassification, each Member ended up with the same proportionate share of the company that he held prior to the reclassification.[21]

The provision that governs the reclassification is § 5.6 of the Operating Agreement, which provides that "the Board may require each Member to transfer such Member's Interests (or any Class or Subclass thereof) in order to facilitate ... (iii) any other fundamental change affecting the organizational structure or business of the Company which has been duly approved by the Board and, to the extent required by this Agreement, the Members." (Def.Ex. 4.)

SCL's Board accomplished the reclassification discussed in § 5.6 by amending the Operating Agreement pursuant to § 5.1.9.4, which permits amendments by "consent of the common members." (*Id.*) The Operating Agreement defines "consent of the common members" as a majority of the common members or the written consent of Erickson. (*Id.*) Because the reclassification was approved by Erickson and a majority of the common members, the reclassification did not breach the Operating Agreement.

The Court concludes that the reclassification falls within the plain meaning of § 5.6 of the Operating Agreement, rather than § 6 of the Members Agreement. Accordingly, the reclassification was an authorized corporate act and the Court will grant Summary Judgment on counts XII and XIII in favor of the defendants and against Froelich.

**G. Count X: Conversion**

Froelich claims that SCL converted his interests by replacing Froelich as CEO and president and by diluting his interests to nearly zero without consent or compensation.

 To establish conversion, a plaintiff must prove:

---

21. Under the reclassification, the existing preferred and common interests were not purchased, but were exchanged for a new unitary class of common interests.

(1) plaintiff's right to possess the property; and

(2) defendant's intentional taking of the property without authority or permission.

*See Travel Committee v. Pan American World Airways, Inc.*, 91 Md.App. 123, 183, 603 A.2d 1301 (Md.Spec.App.1992).

■ Because the Court finds that the Operating Agreement and Members Agreement permitted the reclassification and squeeze-out merger, the defendants had "authority" to exchange Froelich's interests for their appraised fair market value. Moreover, as explained *infra*, the Court finds that the Board's decisions are protected by the business judgment rule. Inherent in the definition of conversion is the concept that the taking must be wrongful. Here, there is no wrongful action. Summary Judgment on Count X will therefore be granted in favor of the defendants.

## H. Count I: Breach of Fiduciary Duty

Froelich asserts that John and Nancy Erickson, and the other "Erickson Members" breached their fiduciary duty as majority interest holders by (i) wrongfully disparaging SCL; (ii) interfering with SCL's business operations; (iii) engaging in self-dealing with regards to the recapitalization and elimination of all interests except Erickson's interests; (iv) devaluing the company and Froelich's interests; and (v) engaging in self-dealing with regards to the sale of the Charlestown property.[22]

■ To establish a breach of fiduciary duty, Froelich must show (i) existence of a fiduciary relationship; (ii) breach of the duty owed by the fiduciary to the beneficiary; and (iii) harm to the beneficiary. *See Lyon*, 120 Md.App. at 439, 707 A.2d 850. Froelich bases his claim on the corporate opportunity doctrine, which "prohibits a fiduciary from usurping, for his personal benefit, a business opportunity rightfully belonging to the corporation." *Id.* at 440, 707 A.2d 850.

It is clear that Erickson, as a majority interest holder, owed a fiduciary duty to the minority interest holders. *See Kerby*, 992 F.Supp. at 803. In addition, as a director of SCL, Erickson owed a fiduciary duty to the Members. Nonetheless, no reasonable jury could conclude that Erickson breached these duties.

■ Stripped to its essence, Count I makes the argument that Erickson usurped a corporate opportunity by retaking control of the company and its profitability. The other allegations (e.g., interfering, disparaging, and devaluing) are the wrongful means by which he improperly seized the corporate opportunity. Froelich's argument fails under the business judgment rule. As reviewed above in the Statement of Facts, the Board independently approved Erickson's proposal and recommended the proposal to the Members, who voted fifteen to one to accept it. Erickson did not participate in the recommendation and abstained from the Board's vote.

As the Court has discussed, there is ample evidence that the financial crisis perceived by the Board was real. There is

---

**22.** As an initial proposition, there is a dispute whether Maryland recognizes an independent cause of action for a breach of fiduciary duty. The principal cases discussing the status of Maryland law are *Kann v. Kann*, 344 Md. 689, 690 A.2d 509 (Md.1997), and *Bresnahan v. Bresnahan*, 115 Md.App. 226, 235, 693 A.2d 1 (Md.Spec.App.1997). The *Bresnahan* court posited, "it is doubtful that [the] creation of an independent tort of breach of fiduciary tort [*sic*] has survived." This finding, however, is dicta because the defendants in *Bresnahan* failed to preserve for appeal their argument as to the validity of this cause of action.

Subsequent to *Kann* and *Bresnahan*, a split of authority has developed as to whether the Court of Appeals rejected breach of fiduciary duty as an independent tort. *See Kerby v. Mortgage Funding Corp.*, 992 F.Supp. 787, 803 (D.Md.1998); *Dickson v. Smith*, 18 F.Supp.2d 559 (D.Md.1998); *Lyon v. Campbell*, 120 Md.App. 412, 440, 707 A.2d 850 (Md.Spec.App.1998). This Court need not decide the issue. Even assuming *arguendo* that a claim exists, Erickson is entitled to judgment as a matter of law.

no credible evidence that Erickson created the crisis. The Board viewed Erickson's proposal to be the best alternative for the company and its Members. With Froelich's sole dissent, the Members agreed.

Because Froelich has not presented evidence establishing that Erickson or the Board acted in bad faith, the decisions of the Board are protected by the business judgment rule. The Court will grant Summary Judgment in favor of the defendants on Count I.

## I. Count XI: Appraisal Remedy

Maryland corporate law provides shareholders with appraisal rights in connection with certain transactions. Froelich contends that as an objecting interest holder, he is entitled to a statutory appraisal as to the reclassification and the squeeze-out merger. The defendants agree that Froelich has perfected his statutory appraisal remedy with respect to the squeeze-out merger. They, however, contend that (i) the reclassification is not the type of corporate transaction for which an appraisal is available and (ii) in any event, Froelich did not timely invoke his appraisal rights with respect to the reclassification.

If Froelich is correct, the Court will appoint an independent appraiser to determine the value of his interests as of November 5, 1997.[23] If the defendants are correct, then Froelich is entitled to an appraisal, but the appraisal will value Froelich's 0.000001091548107% interest in the unitary class of common interests as of February 1998.

An investigation of these claims requires an analysis of section 4A–705 of the Maryland Code, Corporations and Associations Article. This provision grants a member of an LLC objecting to a merger the same appraisal rights as an objecting stockholder pursuant to §§ 3–202, et seq. of the Maryland Corporations and Associations Article, which provides general appraisal

remedies for shareholders of traditional corporations.

Section 3–203 sets forth the procedural requirements to receive an appraisal. The section states that a stockholder objecting to a merger of 90% of a subsidiary with its parent must file a written objection with the corporation within 30 days after receiving notice. For any other transaction, the objecting stockholder must file a written objection at or before the stockholder's meeting at which the transaction will be considered.

For the purpose of applying the appraisal statute, the Court views the November 1997 reclassification and the February 1998 squeeze-out merger as two parts of a single transaction. In November, SCL voted to approve the reclassification and hired Coopers & Lybrand to value the company. At this time, SCL anticipated that all interests in the company, except for Erickson's interests, would be squeezed out if the company was worth less than Erickson's preferred interests.

The disclosure statement to the Members states that "if the fair value of the Company is below the liquidation value of the Preferred Interests ... then the Members holding Common Interests will retain no equity interest in the Company." (Def.Ex. 22.) Further, Erickson's proposal returned voting control of the company to him. (*See* Def. Ex. 16.) Erickson would, therefore, be able to approve the squeeze-out merger unilaterally. Based upon the language of the disclosure statement and Erickson's ability to approve the squeeze-out merger, the Court concludes that the reclassification and valuation were necessary preludes to the squeeze-out merger, and not independent events.

Froelich properly objected to the February merger. This objection also invoked Froelich's appraisal rights with respect to the related reclassification and appraisal.

---

**23.** Froelich initially asserts that he is entitled to an appraisal of the current value of his preferred and common interests. Froelich reasons that the reclassification was void be-

cause it breached the Members Agreement. Because the Court has already concluded that the reclassification was valid, the Court will not discuss this assertion further.

His interests will be valued as of November 5, 1997, which is just prior to the reclassification.[24] Because Froelich objected to the reclassification and merger, he is entitled to receive his share of the company measured just before the events to which he objected.

The Court will, therefore, grant Summary Judgment in favor of the plaintiff and against the defendants on Count XI.[25] Within fifteen days from the date of this Memorandum and Order, the parties shall submit a joint status report advising the Court (i) whether they wish the appraisal to take place now, or following the resolution of any appeal of this Order, and (ii) whether the parties have reached an agreement as to the mechanics of the appraisal, including the names of three appraisers. If an agreement has not been reached, the parties shall each submit three names of independent appraisers. The Court will then choose among the candidates.

### J. Counts VII and VIII: Injunctive Relief and Declaratory Judgment

Froelich seeks a declaratory judgment rescinding the modifications to the Operating Agreement as well as any "unilateral actions" by Erickson and SCL. He also seeks an injunction prohibiting SCL from eliminating Froelich's ownership interest through SCL's squeeze-out merger. The allegations and relief sought in these counts are duplicative of the other counts in the Second Amended Complaint. The Court will therefore grant Summary Judgment in favor of the defendants on these counts.

### K. Count XIV: Breach of Warrant

At the hearing on March 29, 2000, both parties stipulated that Froelich's warrant was still in effect. Based upon this stipulation, the Court will dismiss Count XIV as moot.

### IV. Conclusion

For the reasons stated above, the Court will, by separate Order, GRANT in part and DENY in part Defendants' Motion for Summary Judgment, GRANT in part and DENY in part Plaintiff's Motion for Partial Summary Judgment, and ORDER the parties to submit a joint status report within fifteen days of the date of this Memorandum and Order advising the Court as to whether they have agreed upon the timing and mechanics of the appraisal.

---

**24.** The defendants also contend that Froelich is not entitled to appraisal rights because § 5.6 of the Operating Agreement permitted the reclassification. Section 5.6 of the Operating Agreement, which permits the reclassification but does not discuss mergers, does not apply to appraisal rights.

**25.** Froelich may end up with a pyrrhic victory, as there is a likelihood that Froelich's pre-reclassification interests are worthless. Nonetheless, Froelich contends that the Coopers & Lybrand appraisal was flawed, and he will now have recourse to a Court supervised appraisal.