PUBLISHED

# UNITED STATES COURT OF APPEALS

## FOR THE FOURTH CIRCUIT

BRIAN P. FROELICH,
          *Plaintiff-Appellee,*

v.

SENIOR CAMPUS LIVING LLC,
          *Defendant-Appellant,*

          and                                    No. 02-2305

JOHN C. ERICKSON; NANCY ERICKSON;
SCL, INC.; ERICKSON RESOURCE
TRUST; SCL CONSTRUCTION, INC.;
SUBCO, INC.; SENIOR CAMPUS LIVING
HOLDINGS LLC,
          *Defendants.*

Appeal from the United States District Court
for the District of Maryland, at Baltimore.
Paul W. Grimm, Magistrate Judge.
(CA-98-694-L)

Argued: October 31, 2003

Decided: January 22, 2004

Before MICHAEL, MOTZ, and TRAXLER, Circuit Judges.

Affirmed by published opinion. Judge Motz wrote the opinion, in which Judge Michael and Judge Traxler joined.

## COUNSEL

**ARGUED:** James David Mathias, PIPER RUDNICK, L.L.P., Baltimore, Maryland, for Appellant. Michael John Collins, THOMAS &

LIBOWITZ, P.A., Baltimore, Maryland, for Appellee. **ON BRIEF:** John R. Wellschlager, PIPER RUDNICK, L.L.P., Baltimore, Maryland, for Appellant.

---

**OPINION**

DIANA GRIBBON MOTZ, Circuit Judge:

This diversity case involves a challenge to the valuation of a limited liability company as determined by the statutory appraisal procedure provided under Maryland law. A member of the company, who objected to a reclassification of membership interests and squeeze-out merger that eliminated his interest in the company, exercised his right to have a statutory appraisal resolve the fair value of that interest immediately prior to the reclassification. The district court accordingly appointed a panel of three appraisers, who determined the value of the interest as of the day the company's members voted to approve the reclassification. The company contends a court must adjust the valuation of that appraisal panel "downward" or order a new appraisal because (1) the objecting interest holder assertedly presented to the appraisers evidence and arguments that conflicted with earlier rulings of the district court and (2) the appraisers improperly included in their valuation appreciation resulting from the contested reclassification. The magistrate judge, who presided over the appraisal proceedings with the agreement of the parties, rejected these arguments and entered judgment for the member on the basis of the court-appointed appraisers' valuation of the company. For the reasons that follow, we affirm.

I.

This appeal grows out of a dispute between Senior Campus Living, LLC ("SCL"), a developer of large, campus-style retirement communities, and one of its former employees and interest holders Brian Froelich. SCL owns a number of operating retirement communities and several future projects in various stages of development.

One future project regarded as critical by SCL in the fall of 1997 was Greenspring Village in Springfield, Virginia. Equitable Real

Estate Investment Management, Inc. ("Equitable") had agreed to provide $26 million in mezzanine financing for Greenspring if SCL first obtained $55 million in construction financing. By September 1997, SCL had obtained a $55 million construction loan from Mercantile-Safe Deposit & Trust Company, but only on the condition that SCL founder John Erickson — who still had substantial financial interests in SCL despite selling the firm to Froelich and others in a leveraged buy-out in 1996 — personally guarantee the loan. Erickson agreed to provide the guarantee, and Equitable then scheduled the closing for the Greenspring financing for October 3, 1997.

On October 1, 1997, however, the SCL Board voted to remove Froelich from his position as Chief Executive Officer of the company and replace him with Erickson. As a result, Equitable decided to postpone the Greenspring closing. Equitable subsequently notified SCL that it would require an *additional* $35 million in personal guarantees from Erickson to assuage its concerns about SCL's financial condition.

Erickson told the SCL Board that he would provide personal guarantees for the additional $35 million if the Board reclassified its membership interests (both preferred and common) into a single class of common interests, with the reclassification to be based upon the fair market value of the company determined by an independent appraisal. Under the previous classification of membership interests (resulting from the 1996 leveraged buy-out), Erickson had preferred interests in the company worth about $160 million (including accrued and unpaid interest). In addition, Froelich and Erickson's brother, Michael Erickson, had subordinate preferred interests with assigned values of $8 million and $4 million, respectively. The common interests in the company were allotted among John Erickson (30%), Michael Erickson (26%), Froelich (26%), and thirteen other SCL employees (34%).

These subordinate preferred and common interests only had value to the extent the company was worth more than the value of Erickson's senior preferred interests, i.e., $160 million. Thus, if the Board acted on Erickson's proposal to reclassify the company's preferred and common interests into a single class of common interests based on the company's fair market value, Erickson would end up with vir-

tually all of the common stock of SCL if the appraisal valued the company at less than $160 million.

After forming independent committees to negotiate with Erickson regarding his proposal, explore available alternatives to Erickson's offer, and confer with Equitable regarding the Greenspring closing, the SCL Board unanimously voted to recommend to the members that they accept Erickson's reclassification proposal. By November 5, 1997, fifteen of sixteen members had approved the proposal, with only Froelich dissenting. On November 6, 1997, after Erickson supplied the additional $35 million in guarantees, SCL, in Erickson's words, "completed the signing and execution of all documents with Mercantile and Equitable for the $80 million project financing for [the] Greenspring [project]."

In December 1997, SCL retained Coopers & Lybrand, LLP ("Coopers") to perform an independent appraisal valuing the company as of the November 5, 1997 reclassification. Coopers valued SCL at $155 million. This valuation included an appraisal of $6.325 million for the Greenspring project. The SCL Board accepted Coopers' valuation in January 1998. Because Coopers appraised the company at less than the value of Erickson's preferred interests (i.e., $160 million), the reclassification resulted in Erickson holding 99.9% of the new common interests and left Froelich with $1.50 after a squeeze-out merger in February 1998 eliminated his remaining interest.

Shortly after the squeeze-out merger, Froelich filed a fourteen count complaint against SCL, Erickson, and others in federal court. Froelich alleged, *inter alia*, breach of fiduciary duty, asserting that Erickson had disparaged SCL to potential investors (thereby thwarting SCL's ability to obtain capital) in order to regain control over SCL and had devalued and engaged in self-dealing with respect to Froelich's preferred and common interests. Froelich also alleged fraud, claiming that Erickson and the SCL Board had agreed, at the time of the 1996 leveraged buy-out of SCL, that Erickson would relinquish authority to run SCL and not disparage SCL, when in fact they knew that Erickson would not honor this agreement. In addition, Froelich asserted rights to severance pay and to a statutory appraisal

(the latter of which had allegedly been triggered by the November 5, 1997 reclassification and subsequent squeeze-out merger).

Judge Benson Legg granted summary judgment to SCL on all allegations of fraud and breach of fiduciary duty. *See Froelich v. Erickson*, 96 F. Supp. 2d 507, 511 (D. Md. 2000). However, Judge Legg granted summary judgment to Froelich with respect to his claim for severance pay and his demand for a statutory appraisal. *Id.* at 511. As to the latter, the judge concluded that "Froelich is entitled to appraisal rights" and that appraisers would be appointed to value Froelich's interest in SCL "as of November 5, 1997, which is just prior to the reclassification." *Id.* at 511, 528. In an unpublished opinion, we affirmed in all respects the judgment entered by Judge Legg. *Froelich v. Senior Campus Living, LLC*, No. L-98-694, 2001 WL 256080 (4th Cir. Mar. 15, 2001).

Judge Legg then followed the procedures set forth in Md. Code Ann., Corps. & Ass'ns § 3-210(a) (1999) and appointed three disinterested appraisers, whom SCL and Froelich had recommended, to value SCL as of November 5, 1997. The appraisers appointed to perform the valuation were Patrick O. Ring, Joseph T. Gardemal, and Robert A. Frank. Patrick O. Ring, the panel chairman, received an MBA in financing from Wharton, worked as a bank officer for almost twenty years, wrote over thirty articles on business valuation and other financial subjects, and since 1992 had worked with the Baker-Meekins Company, Inc., a business valuation company. Joseph T. Gardemal, another panel member, was certified as a public accountant, fraud examiner, valuation panelist, and government financial manager, and had worked in a number of accounting firms on business valuation and related financial matters and was currently working with Capital Analysis Group, a financial consulting firm, in which he was responsible for business valuation and litigation support. Finally, Robert A. Frank was a chartered financial analyst, who had worked as a managing director of a real estate securities research group and was currently serving as the managing director of InCap Group, Inc.

The parties agreed that Magistrate Judge Paul W. Grimm would preside over the appraisal proceedings. The parties submitted two bound volumes of exhibits and deposition excerpts to the three

appraisers, who heard testimony from witnesses for three days in March 2002. The appraisers considered evidence that included a letter dated December 22, 1997, from an SCL Board Member to Coopers stating that SCL "has been unable to secure financing to further develop the 'Future Projects' [including Greenspring]," despite the fact that as of the November 5, 1997 valuation date, arrangements for financing the Greenspring project were in place (except for provision of $35 million in personal guarantees from Erickson) and that SCL actually closed on the Greenspring project on November 6, 1997. The appraisers also heard testimony from Coopers officials indicating that Coopers had relied on these representations in its appraisal. Additionally, an Equitable official testified that Equitable might have been willing to close on the Greenspring deal without Erickson's $35 million guarantee as long as the full $55 million in construction financing was in place. Froelich also presented the appraisers with evidence regarding the willingness of other financial institutions to invest in SCL.

After considering this and other evidence, the appraisers heard closing arguments and received lengthy memoranda from the parties. On June 17, 2002, the panel issued majority and minority reports; all three appraisers determined that the value of SCL as of November 5, 1997, was $176 million, which was $21 million higher than Coopers' $155 million valuation.

Two members of the panel, Ring and Gardemal, issued a thirty-four page majority report, which used two separate valuation methods to value SCL at $176 million. Ring and Gardemal's first method analyzed the approaches used in the three appraisal reports submitted to the panel (the Coopers report, as well as two additional reports — one commissioned by each of the parties), and then determined which approach arrived at the most reasonable conclusion as to the fair value of each SCL property. In this lead analysis, Ring and Gardemal adopted the $34 million valuation of the Greenspring project calculated by Froelich's appraiser, Thomas Nagle of Valuation Counselors, rather than Coopers' $6.325 million valuation of Greenspring or the $20.94 million valuation advanced by the expert commissioned by SCL. Ring and Gardemal also adopted Nagle's valuations for all of SCL's current projects (which were generally *lower* that those offered by Coopers), and adopted estimates significantly lower than Nagle's

for SCL's other future projects. Thus, the majority panelists' higher appraisal for Greenspring largely explains why their $176 million total valuation of SCL significantly exceeded Coopers' $155 million total valuation.[1]

To "test the validity" of the $176 million total valuation based on their lead analysis, Ring and Gardemal conducted an alternative independent valuation analysis, which used cash flow projections provided by SCL management. This alternative valuation confirmed the $176 million value they had reached in the lead analysis. Further, the third member of the panel, Robert Frank, filed an eighteen-page separate report, in which he employed still a different valuation method to arrive at an identical total value for SCL of $176 million as of November 5, 1997.

Both SCL and Froelich filed objections seeking modification of the appraisal assessment. Judge Grimm heard extensive oral argument, and then, in a thorough and persuasive oral opinion, denied the objections and adopted the appraisal panel's unanimous conclusion that the value of SCL as of November 5, 1997, was $176 million. Judge Grimm concluded that SCL had not shown that any part of the Greenspring valuation conflicted with "Judge Legg's ruling that the decision of the board of directors fell within the protection of the business judgment rule," nor had it presented evidence sufficient to convince him that the panel had erroneously included value created by the reclassification by failing to adjust for Erickson's $35 million in personal guarantees. Further, Judge Grimm held that even if he had found the majority's lead analysis to be defective, he would have simply adopted the majority's alternative analysis or Frank's minority report as his own valuation, and that this would have "correct[ed] the error." Judge Grimm entered final judgment in favor of Froelich in the amount of about $11.2 million, representing the value of his interest in SCL on November 5, 1997, and pre-judgment interest.

SCL noted a timely appeal; Froelich does not cross appeal.

---

[1]The majority panelists' lower appraisal for most of SCL's other future projects meant that their estimate for the total value of SCL was $72 million lower than Nagle's $248 million assessment.

II.

The Maryland General Assembly first authorized corporate consolidations and mergers in 1868. *See Roselle Park Trust Co. v. Ward Baking Corp.*, 9 A.2d 228, 231 (Md. 1939). Four decades later, in 1908, the General Assembly enacted legislation providing a stockholder objecting to a consolidation, merger, or sale of all corporate assets the right to demand fair value for his interests, as determined by a statutory appraisal. *See Warren v. Baltimore Transit Co.*, 154 A.2d 796, 798 (Md. 1959); *Am. Gen. Corp. v. Camp*, 190 A. 225, 227 (Md. 1937). This legislation was intended to overcome the problem, which had "proved in the past a disadvantage to the other stockholders," of objecting stockholders blocking mergers or consolidations arguably beneficial to the corporation, "and, at the same time, to protect" fully the property rights of the objecting stockholder. *Am. Gen. Corp.*, 190 A. at 227.

Thus for almost a century, Maryland has provided by statute that: (1) "by compliance with prescribed conditions and procedure" one Maryland corporation can be consolidated with, or merged into, another, or sell substantially all of its assets, with the approval of less than all of the stockholders, *id.*, but (2) stockholders objecting to the consolidation, merger, or sale of substantially all corporate assets, upon satisfaction of certain conditions, have the absolute statutory "right to demand and receive payment of the fair value of the stockholder's stock from the successor," Md. Code Ann., Corps. & Assn's § 3-202(a) (1999).[2] *See* Md. Code Ann., Corps. & Assn's §§ 3-101 *et seq.* (1999). *See generally*, J.J. Hanks, Jr., Maryland Corporation Law § 10.1-10-8 at 329-43 (1990 and 2002 supp.) (hereinafter "Hanks"); B. Manning, *The Stockholders Appraisal Remedy: An Essay for Frank Coker*, 72 Yale L.J. 223 (1962).

---

[2]Md. Code Ann., Corps. & Assn's § 4A-705 (1999) confers on "[a] member of a limited liability company objecting to a merger of the limited liability company" the "same rights with respect to the member's interest in the limited liability company as a stockholder of a Maryland corporation who objects has with respect to the stockholder's stock under" Md. Code Ann., Corps. & Assn's §§ 3-202 *et seq.* (1999).

The Maryland General Corporation Law directs that this "fair value" is to be determined by an appraisal performed by three court-appointed "disinterested appraisers." Md. Code Ann. Corps. & Assn's § 3-210(a) (1999). The statute sets forth the valuation date, providing that, with exceptions inapplicable here, "fair value is determined as of the close of business . . . on the day the stockholders voted on the transaction objected to" (which the parties agree is November 5, 1997 in this case). § 3-202(b)(1)(ii). The statute further provides that, again with inapplicable exceptions, "fair value may not include any appreciation or depreciation which directly or indirectly results from the transaction objected to or from its proposal." § 3-202(b)(2). It also sets forth in some detail the procedure to be followed in obtaining a statutory determination of "fair value," including the time in which an objecting stockholder can exercise his appraisal right, the required notices, and the content of the petition for appraisal. *See* §§ 3-203 to 3-208. Finally, the statute provides that the court shall, after consideration of the appraisers' report and on motion of any party, "enter an order which . . . [c]onfirms, modifies, or rejects it." § 3-211(a)(1).

The Maryland General Corporation Law does not, however, further define or describe "fair value."[3] Nor does it set forth the standard a court should employ in reviewing the appraisers' determination of "fair value." Moreover, notwithstanding the venerable history of the Maryland statutory appraisal right, few cases have discussed the meaning of "fair value" or the role of courts in reviewing the statutory appraisers' resolution of that question. In those few cases, however, Maryland's high court has provided some helpful guidance.

The court has recognized that each corporation poses a "particular" valuation problem and noted "the manifold possibilities and difficulties of the problem, and the impracticability of the statement of any rule of uniform application as to the factors of fair value." *Am. Gen. Corp.*, 190 A. at 229. The court has also pointed out that "[t]he real objective is to ascertain the actual worth of that which the dissenter

---

[3]State appraisal statutes "variously" provide a dissenting stockholder is entitled to "market value," "fair value," "value" or "fair cash value." H.G. Henn, Law of Corporations § 349 at 1002 (3d ed. 1983). Maryland's high court has noted that these "terms are considered synonymous." *Warren*, 154 A.2d at 799.

loses because of his unwillingness to go along with the controlling stockholders, that is, to indemnify him." *Warren*, 154 A.2d at 799. Thus, although the value of the dissenting stockholder's stock "should not be affected by a corporate change in which he refused to participate," *Am. Gen. Corp.*, 190 A. at 228, the corporation should, unless in liquidation, be valued "by assuming that [it] will continue as a going concern" and "by appraising all material factors and elements that affect value. . . ." *Warren*, 154 A.2d at 799; *see* Hanks, § 10.6 at 340. Accordingly, "that the corporation may not offer [stockholders] more than the market value does not mean that the appraisers are so limited." *Burke v. Fid. Trust Co.*, 96 A.2d 254, 259 (Md. 1953).

Given the complexity and idiosyncracies of the valuation of a dissenting stockholder's interest, it is hardly surprising that the Maryland courts have concluded that the role of the judiciary in an appraisal proceeding is "limited." *Warren*, 154 A.2d at 800. In recognition that "[t]he questions involved are rather economic than legal in character," courts are to "give great weight to the findings of the appraisers." *Id.* (internal quotation marks omitted). Thus, the standard for judicial review of an appraisal panel's determination of fair value is extremely deferential:

> The presumption is that their award is correct, and effect will be given to their determination unless it appear by clear and satisfactory evidence that the award was, by reason of some material and prejudicial error of law, in conduct or of fact, not the fair value of the stock, without regard to any depreciation or appreciation thereof in consequence of the merger or consolidation.

*Am. Gen. Corp.*, 190 A. at 230; *accord Warren*, 154 A.2d at 800; *see also Burke*, 96 A.2d at 259.

With these principles in mind, we turn to SCL's two challenges regarding the statutory appraisal in this case.

### III.

SCL initially contends that Judge Grimm erred in permitting Froelich to present certain evidence and arguments to the appraisal

panel that "directly contradict[ ] the prior, binding judicial rulings of Judge Legg and this Court." Brief of Appellant at 4. Specifically, SCL complains that Judge Grimm ignored Judge Legg's prior rulings in permitting Froelich to offer evidence and argument that Coopers' November 5, 1997 appraisal was flawed because Coopers did not receive accurate and complete information from Erickson and SCL officials on which to base its appraisal. *Id.* at 23. The company asserts that Froelich's submissions regarding the Cooper appraisal directly conflict with Judge Legg's rejection of Froelich's fraud and breach of fiduciary duty claims against SCL and Erickson and Judge Legg's finding that "the decisions of the [SCL] Board are protected by the business judgment rule." *Froelich*, 96 F. Supp. 2d at 527.

SCL's argument rests on a misunderstanding of Judge Legg's initial findings, the statutory appraisal process, and the deference accorded a trial court's rulings as to the propriety of legal argument and the admissibility of evidence.

First, Judge Legg never addressed most of the grounds on which SCL objects to Froelich's evidence and argument. For example, in granting summary judgment to Erickson and SCL on Froelich's fraud counts, Judge Legg understandably addressed only Froelich's relevant allegations, i.e., that Erickson and the SCL Board had fraudulently represented to Froelich in the 1996 leveraged buy-out of SCL that Erickson would relinquish authority to run SCL and not make disparaging remarks about the company when they knew he had no intention of honoring this agreement. *Froelich*, 96 F. Supp. 2d. at 522-23. Similarly, in granting Erickson summary judgment on Froelich's breach of fiduciary duty claim, Judge Legg only rejected Froelich's contention that "Erickson usurped a corporate opportunity by retaking control of the company and its profitability," finding "no credible evidence that Erickson created [a financial] crisis" or that the SCL Board did not actually view Erickson's proposal as the best alternative for the company. *Id.* at 526-27. Nowhere in these rulings, or his rulings on Froelich's other counts, did Judge Legg even discuss SCL's provision of information to Coopers.

Certainly, Judge Legg never determined the *factual accuracy* of the financing information SCL submitted to Coopers. Contrary to SCL's suggestions, Judge Legg's ruling that the business judgment rule pro-

tected the SCL Board does not equate to a finding that the Board's decisions were *correct*. The business judgment rule simply requires courts to defer to the decisions of corporate boards unless a challenger produces evidence establishing that the directors acted fraudulently or in bad faith, *NAACP v. Golding*, 679 A.2d 554, 559 (Md. 1996), or with gross or culpable negligence, *Parish v. Maryland & Virginia Milk Producers Ass'n*, 242 A.2d 512, 540 (Md. 1968); *see* Md. Code Ann., Corps. & Assn's § 2-405.1 (1999) (codifying standard of care required of corporate directors); *see also Hanks*, § 6.8 at 179-83 (2000 supp.). Under the business judgment rule, "[a]ll that is required" of directors is that they "act reasonably and in good faith in carrying out their duties"; they "are *not expected to be incapable of error*." *NAACP*, 679 A.2d at 559 (emphasis added) (internal quotation marks and citation omitted).[4]

We recognize that Froelich's arguments that Erickson or other SCL officials withheld relevant information from Coopers resulting in fatal flaws in Coopers' valuation may be in some tension with Judge Legg's rejection of Froelich's fraud and breach of fiduciary duty claims. But that tension does not constitute an irreconcilable conflict. Judge Legg found Froelich entitled to a statutory appraisal *at the very same time* he rejected Froelich's fraud and fiduciary duty claims. Moreover, Judge Legg explicitly recognized that Froelich's likelihood of success before the appraisers *depended* upon his ability to prove to them "that the Coopers and Lybrand appraisal was flawed." *Froelich*, 96 F. Supp. 2d at 528 n.25. This entirely accords with the long-established view of the Maryland Court of Appeals that, without any proof of fraud, majority and minority stockholders may hold a "wide variance in opinion" as to the value of a corporation, necessitating a statutory appraisal. *See Homer v. Crown Cork & Seal Co.*, 141 A. 425, 432 (Md. 1928); *accord Lerner v. Lerner*, 511 A.2d 501, 506 (Md. 1986); *see also Walk v. Baltimore & Ohio R.R.*, 847 F.2d 1100, 1107 (4th Cir. 1988) (noting, in the course of applying Maryland law, that "allegations of 'fraud' are often nothing more than disagreements about methods of valuation, which are more appropriately resolved in

---

[4]SCL points to no authority suggesting that the business judgment rule applies to statutory appraisals, such that appraisers must similarly defer to a board's conclusions. Such a requirement would, of course, undercut the very purpose of having an independent statutory appraisal.

the statutory appraisal proceeding"), *vacated on other grounds by* 492 U.S. 914 (1989).

Indeed, the very purpose of the statutory appraisal in this case — to value the company to determine the fair value of Froelich's interest as of November 5, 1997 — virtually required the appraisers to consider all evidence as to any shortcomings in the Coopers appraisal. Section 3-202(a) directs statutory appraisers to determine the "fair value" of a stockholder's interest in the corporation; in doing so, the appraisers must consider "*all material* factors and elements that affect value." *Warren*, 154 A.2d at 799 (emphasis added). Because Coopers valued SCL at less than $160 million as of November 5, the reclassification of the company approved on that date resulted in a total elimination of Froelich's interest. The validity of the Coopers appraisal, therefore, certainly constituted a "material factor[ ] affect[ing] [the] value" of Froelich's interest, which, under *Warren*, the statutory appraisers were *required* to consider.

Finally, SCL's argument completely ignores the operative standard of review when examining rulings challenging legal arguments as improper or evidence as inadmissible, under which we will vacate a judgment only if the trial court abused its discretion. *See Rowland v. Am. Gen. Fin., Inc.*, 340 F.3d 187, 194 (4th Cir. 2003); *Arnold v. E. Air Lines, Inc.*, 681 F.2d 186, 194-95 (4th Cir. 1982). Because of a trial judge's "superior vantage point" we defer to him or her in such matters even in jury trials, *see, e.g., Arnold*, 681 F.2d at 197, when any improper argument or inadmissible evidence could mislead lay people. This deference seems all the more appropriate in statutory appraisal proceedings in which three sophisticated business people determine the primarily economic question of corporate value. *See Warren*, 154 A.2d at 800-01.

Our close review of the record here reveals no abuse of discretion. Rather, Froelich presented the appraisers with a very substantial amount of appropriate evidence and argument supporting his contention that the Coopers appraisal lacked validity. Accordingly, contrary to SCL's contentions, it was well within the district court's discretion to find that any fragments of improper argument or inadmissible evidence did not "unfairly prejudic[e]" the company. Brief of Appellant at 16. Indeed, we note that Judge Grimm's patient superintending of

numerous documents and complicated testimony and his scrupulous consideration of the parties' legal contentions before, during, and after the appraisal hearings evidence the utmost care, rather than any abuse of discretion.

IV.

SCL also contends that we must reject the statutory appraisal because it includes appreciation in value resulting from the very reclassification of SCL stock to which Froelich objected. As noted above, the Maryland General Corporation Law expressly prohibits appraisers from including in their "fair value" determination "any appreciation . . . which directly or indirectly *results from* the transaction objected to or from its proposal." § 3-202(b)(2) (emphasis added).

According to SCL, the November 5 reclassification was needed to obtain Erickson's agreement to pledge guarantees of $35 million, which in turn were needed to secure the $80 million in financing commitments for the November 6 closing on the Greenspring project. Therefore, in the company's view, any value evidenced by the $80 million closing necessarily derived from the $35 million in guarantees that "result[ed] from" the reclassification and so should not have been considered by the appraisers in determining SCL's fair value as of November 5.

Unquestionably, Ring and Gardemal did consider the $80 million, November 6 financing of Greenspring in their lead analysis; they explained that they viewed "SCL's November 6, 1997, closing on the Springfield financing" as "a subsequent event that provides evidence of value that existed as of the [November 5] valuation date." However, SCL has not presented "clear and satisfactory evidence" that, in so considering the November 6 closing, the appraisers necessarily incorporated value *resulting from* the reclassification in violation of § 3-202(b)(2). *Warren*, 154 A.2d at 800 (quoting *Am. Gen. Corp.*, 190 A. at 230).

To start, the mere fact that the appraisers took into account an event that occurred subsequent to the November 5 valuation date and the reclassification does not, in and of itself, violate § 3-202(b)(2).

Indeed, SCL itself acknowledges that "an event occurring subsequent to the valuation date may be considered in hindsight as evidence of value that likewise existed as of the valuation date, even if the subsequent event was not foreseeable on the valuation date." Brief of Appellant at 32.

Moreover, the evidence in the record does not compel the conclusion that approving the reclassification in exchange for Erickson's $35 million in guarantees was in fact the *only* way to close on the financing for Greenspring, as opposed to one option among several that might fall within the discretion of the SCL Board under the business judgment rule. That is, the evidence does not show that declining to approve the reclassification would have precluded SCL from moving forward on the Greenspring project. The record shows that most of the financing for Greenspring was in place well before the reclassification was even proposed. Further, Froelich presented evidence that numerous investors were willing to invest in SCL; he also presented the testimony of an Equitable official who suggested that Equitable might have been willing to close on the Greenspring deal without the guarantees. Indeed, even SCL's own expert opined that SCL "could have obtained the financing for one Future Project *absent* John Erickson's financial support." In light of this evidence, the appraisers were justified in their conclusion that "[w]ith $134.4 million in equity value [for current SCL projects] at the valuation date, the assumption that $80 million in financing commitments would be available for at least one new project in 1998 is entirely reasonable."[5]

Operating under this legitimate assumption, the appraisers were certainly free to conclude that approving the reclassification in exchange for the $35 million in guarantees was, at most, merely one

---

[5]SCL argues that if the $134 million in equity were suddenly encumbered with the liability of the $80 million in financing for Greenspring without the guarantees, its value would have to be adjusted downward (making it impossible to escape the need to make an adjustment downward for the guarantees). But Froelich notes that a hypothetical outside buyer — whose perspective the panel must adopt in its valuation — would not necessarily have to immediately siphon off $65 million in equity, as Erickson planned to do, upon the sale of one of SCL's projects, and that this would make up for any extra encumbrance on the equity.

option among several for providing the final bit of financing needed to close on the Greenspring deal, and not an indispensable step, the absence of which would have prevented any closing from occurring. Thus, the appraisers could reasonably look to the November 6 closing for evidence of the Greenspring project's financeability (and hence value) on November 5, as long as they subtracted whatever they assessed the value or cost of that final bit of financing (in this case, the value of the $35 million guarantees) to be, from the perspective of a hypothetical outside investor. The fact that Gardemal and Ring state that they took the November 6 closing only as evidence that SCL had "*substantially* all of the required financing in place," (emphasis added) — not *all* of the financing in place — suggests that the appraisers did, indeed, subtract those elements of the financing (namely the $35 million in personal guarantees) that actually resulted from the reclassification.

True, Ring and Gardemal never explained in their lead analysis exactly how they accounted for the additional value of the $35 million in guarantees in their valuation. However, given the "presumption . . . that [the appraisers'] award is correct," we cannot take the mere absence of an explicit explanation as "clear and satisfactory evidence" that the majority panelists failed to consider (and properly discount any value added by) the guarantees. *Warren*, 154 A.2d at 800 (quoting *Am. Gen. Corp.*, 190 A. at 230). This is particularly so given that the record not only reveals the appraisal panel's awareness and concern about the guarantees (both in their review of the facts involving these guarantees in their report, and in the questions they posed about the guarantees during the appraisal hearing), but also suggests a number of ways in which they could have engaged in the analysis and reached the result that they did, yet still afforded proper treatment to the guarantees.

For one, if, as just suggested, Ring and Gardemal concluded that SCL's equity sufficed to finance Greenspring and that the $35 million in guarantees were therefore not actually necessary, they may well have determined that the guarantees did *not* significantly affect the value of SCL as of the November 5 valuation date, from the perspective of a hypothetical outside investor.

Alternatively, Ring and Gardemal could have reasoned that they *did* make a significant downward adjustment in value to take into

account the guarantees by adopting Nagle's valuation for Greenspring and for all of SCL's current projects. Nagle testified that he accounted for the value of the guarantees in his *total* estimate of SCL's value by, as SCL itself recognizes, "adding one percentage point to his discount rates on all SCL assets, across the board." Nagle estimated this increase in the discount rate had a total impact of a $17 million downward adjustment, which he testified would "more than offset the provision of a guarantee." By adopting Nagle's valuation of Greenspring and all current projects, then, Ring and Gardemal subsumed a large proportion of Nagle's $17 million downward adjustment in their $176 million appraisal. While they did not adopt *all* of Nagle's valuations (they adopted valuations for the remaining projects that totaled $56 million *less* than Nagle's), the appraisers certainly did not have to incorporate the entirety of Nagle's estimate of the value of the guarantees, which Nagle himself suggested was generous.

Finally, even if we were to conclude that the statutory appraisers erroneously failed to consider the $35 million in additional guarantees in their lead analysis, which we do not, we could simply adopt, as our own valuation, the majority report's alternative analysis or the minority report's analysis, both of which came to an identical valuation of $176 million. SCL has advanced no substantive challenge to the approaches used in either the alternative or minority analysis.[6] We note that Frank's report, in particular, specifically states that he accounted for SCL's need for "outside financing in the form of a $35 million guarantee," by "heavily discount[ing] the Greenspring project" and adopting a discount rate of 33.1%, nearly as large as that used by Coopers.

---

[6]SCL simply argues that we cannot adopt Ring and Gardemal's alternative analysis because they intended it to be only a "test," and that we cannot adopt Frank's minority report because Md. Code Ann., Corps. & Assn's § 3-210(b) states that the "conclusion of the majority as to the fair value of the stock" shall be filed with the court. *See* Reply Brief of Appellant at 22-24. Those arguments are totally unpersuasive. Section 3-211(b)(2)(ii) empowers a court reviewing the appraisers' fair value assessment to substitute its *own* valuation in place of the appraisers' if it rejects the appraisers' award. Therefore, nothing would prevent us from adopting, as our own, the alternative valuation or Frank's valuation.

Thus, SCL's second challenge to the statutory appraisal fares no better than its first.

## V.

For all of these reasons, the judgment of the magistrate judge is

*AFFIRMED*.